NGC INVESTMENT AND DEVELOP-
MENT, INC., and JDL Construc-
tion Co., Inc., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 93–227C.

United States Court of Federal Claims.

May 22, 1995.

Stephen D. Cramer, Seattle, WA, for plaintiffs.

Luis M. Matos, Washington, DC, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, and Jeanne E. Davidson, for defendant.

## OPINION

BRUGGINK, Judge.

This is an action brought under the Contract Disputes Act of 1978. 41 U.S.C. §§ 601–13 (1988). The plaintiffs are two corporations, NGC Investment and Development, Inc., ("NGC") and JDL Construction Co. ("JDL"). They jointly bring a claim for a series of alleged changed conditions on a

contract with the Navy. Defendant has filed a counterclaim asserting fraud. It has now moved for partial summary judgment with respect to the plaintiffs' claims, contending that NGC's claim is barred by the Anti–Assignment Act, 41 U.S.C. § 15 (1988), and that JDL is barred from recovery because it lacks privity with the Government. The matter has been fully briefed, and oral argument is deemed unnecessary. For the reasons set out below, the motion is granted.

## BACKGROUND [1]

The contract at issue was entered into on September 12, 1984, between the procuring entity, Puget Sound Naval Shipyard, and NGC. The contract was signed on behalf of NGC by R.J. Braunschweig, "Director." The work consisted of exterior repairs to a building at the shipyard in Bremerton, Washington. After amendments, the contract amount was fixed at $388,407. Work was to be completed on or before June 24, 1985. The contract required NGC to complete at least twenty percent of the work using its own labor force.

NGC was formed in 1978. It had its offices in Renton, Washington. JDL was formed in 1983. Initially it was run by R.J. Braunschweig's younger brother, Daniel, and operated in southern California. Both companies are involved in the window repair and replacement business. R.J. was a stockholder in both companies, as was his brother, Louis. During the period 1985–86, Louis and R.J. owned more than sixty percent of JDL's stock.

NGC subcontracted with Pacific Erectors, Inc., ("Pacific") to do the required structural steel work, as well as to install liner panels, insulation, siding, and flashing. NGC re-served for itself the demolition of existing windows, installation of new windows, and minor repairs.

On February 20, 1985, NGC sold all of its assets and liabilities, including the shipyard contract, to JDL for a price of $116,251.91. The transaction was memorialized in a Bill of Sale executed by R.J. Braunschweig, as Secretary of NGC.[2] NGC used the proceeds to pay outstanding federal taxes. Plaintiffs allege that prior to this time, NGC personnel had contacted the Contracting Officer ("CO") and proposed, both orally and in writing, an assignment of the contract to JDL. The CO rejected that proposal, however, as R.J. Braunschweig makes clear in his deposition: "[T]he Navy ... told me this couldn't be done because of the fact that they had a bond with NGC, the contract was written with NGC, and NGC had to be maintained, and they had to complete the job. ... I was told at the time that basically, under contract law or government law, that this just couldn't be done. NGC had to complete its contracts." Plaintiffs' Appendix to Opposition to Motion for Summary Judgment ("Pl.App.").

While plaintiffs contest defendant's proposed finding that neither of them informed the Navy or Pacific of the sale and assignment of the contract, they cite no support for their position. The contrary is established by Louis Braunschweig's testimony:

Q. To your knowledge, did NGC ever receive approval from the Navy for the assignment or sale of this contract to JDL?

A. I have no knowledge of it one way or the other.

Q. Did you ever tell the Navy in writing or orally that this contract had been assigned or sold to JDL?

---

1. The facts are drawn from the proposed findings of fact as to which there is no material dispute. Plaintiffs attempted to deny certain of defendant's proposed findings. As discussed in the text, however, these denials are unsupported or flatly contradicted by the only evidence of record. Unsupported denials are insufficient to create an issue of fact.

2. When asked in Interrogatory No. 22 to "state whether the contract was sold by NGC to JDL," plaintiffs responded, "No." Plaintiffs' Appendix to Opposition to Motion for Summary Judgment. Plaintiffs nevertheless did not contest Defen-dant's Proposed Finding of Uncontroverted Fact No. 5: "NGC sold its assets and liabilities, including the contract, to JDL Construction Co., Inc." In one of his depositions, Louis Braunschweig was asked if NGC had sold the contract at issue to JDL. His response was: "[I]t would appear that way." Appendix to Defendant's Motion for Summary Judgment at 109. (Plaintiffs' counsel's attempt in that deposition to draw a distinction between sale of the contract and sale of the contract proceeds is not supported by the bill of sale.)

A.  I did not.

Q.  Did you ever instruct anybody else to alert the Navy or disclose to the Navy this transaction?

A.  To my recollection, I did not.

. . . .

Q.  And have you ever seen anything in writing at all that causes you to think that NGC disclosed to the Navy that this contract had been assigned or sold to JDL?

A.  Not to my knowledge.

Appendix to Defendant's Motion for Summary Judgment ("Def.App.") at 106–07. He expressed similar ignorance of any such notification to Pacific. *Id.* at 107–08.

Defendant contends in its proposed findings that it was JDL that completed the contract work after February 1985. Plaintiffs refuse to concede that point, referring to their own answer to defendant's Requests for Admission No. 2 that NGC "finished all contract work." Pl.App. They contend in the statement of genuine issues that: "All construction management between the date of the attempted assignment and the date of completion was performed by NGC." No support in the record is cited for either proposition, and the court's own examination yields none.

The plaintiffs own answers to defendant's requests for admission prove nothing on plaintiffs' behalf. In fact, defendant's contention is supported by the deposition of R.J. Braunschweig, in which he was asked: "In fact, at this point in time is it correct that JDL really owned this contract? In other words, NGC had already sold this contract to JDL, correct?" To which he responded: "JDL was doing the work, yes." Def.App. at 99. He went on to testify that the two companies at this point were "operating as one . . . . In other words, [JDL] would have taken over theirs . . . . NGC failed to function any further at that point." *Id.* at 100. When asked if it "would basically be JDL sales after approximately February of '85," he responded: "Yes, I would say it is probably all JDL as far as sales. They were actually managing and running the job." *Id.* at 101.

In his deposition, Louis Braunschweig was asked the question: "After this contract was sold by NGC to JDL, to your knowledge did NGC have any continuing involvement in the job?" He responded: "Not to my knowledge." *Id.* at 105. He testified that he did not know whether NGC sustained any contract costs after the February sale and that he was not told by others that it had. *Id.* at 111.

Plaintiffs attempt to make the facts fit their theory by stating in their answers to defendant's Request for Admission No. 6 that "Robert J. Braunschweig managed the project as a bond signatory, and as a corporate officer of NGC." Pl.App. Although R.J. Braunschweig apparently held positions or interests in a number of corporations or other entities, plaintiffs fail to explain how any status he might have had with NGC creates a legal basis for that company's continuing involvement with the contract, especially in light of the complete sale of NGC's assets.

There is no suggestion that JDL subcontracted back with NGC to manage the contract. As plaintiffs concede, work went on merely under the name of NGC: "All correspondence was sent out under the name of NGC, which was still a legal corporation. NGC was maintained because of the government contracts which could not be assigned per Robert J. Braunschweig's conversation with the U.S. Department of the Navy." *Id.* at 11. The correspondence and daily reports were submitted in the name of NGC. After the sale of the contract, certified payrolls were submitted representing that certain individuals had been employed at the site by NGC. In fact, those employees and others were paid by JDL, although plaintiffs allege, without support, that NGC later reimbursed JDL. NGC continued to send progress payment requests to the Navy representing that NGC had performed the work.

Louis Braunschweig expressed his view on whether NGC needed to inform the Government of the transfer as follows: "JDL was effectively managing, collecting funds and disbursing funds, no differently than NGC would have. Consequently, there was no

apparent purpose in informing the Government." Def.App. at 111–12.

Plaintiffs' refusals to admit Defendant's Proposed Findings Nos. 8–11 cannot be considered credible.[3] The refusals are flatly contradicted by statements made under oath by R.J. Braunschweig. Plaintiffs' attempts at obfuscation are apparent in such meaningless and contradictory statements as appear in their Statement of Genuine Issues at paragraphs 3 and 4. Paragraph 3, a response to Defendant's Proposed Finding No. 10, states that after February 20, 1985, NGC performed no work relating to the contract. Plaintiffs respond that "In fact, NGC completed the project as indicated above.[4]" Nevertheless, "in order to complete the project," NGC found it necessary to "establish[ ] an entity identified as 'Pacific Construction Co.', to whom some payments were made." NGC "completed the project, sometimes under the auspices of Pacific Construction Co.," despite the fact that "[i]n reality, Pacific Construction Co. never existed and was nothing more than a subdivision of NGC." Pl. Statement of Genuine Issues at ¶¶ 3, 4. As this tortuous explanation makes clear, plaintiffs are attempting to use verbal smoke and mirrors to avoid the conclusion that they chose to proceed with an assignment the Navy expressly rejected because it violated both NGC's contractual obligation and the Anti–Assignment Act.

Although plaintiffs' brief states that "NGC effectively merged or consolidated with JDL," Pl.Br. of March 13, 1995, at 5, there is no support for that characterization. The same can be said for the statement in the verified complaint at paragraph three: "At all relevant times, Plaintiff NGC Investment and Development, Inc. and JDL Construction Co., Inc. were the same legal entity, having common shareholders, officers, directors, and purpose." The suggestion that the two corporations were the same entity is contradicted by the attachments to plaintiffs' own briefing materials. Exhibits D, E, and F are the corporate legislation and license renewals for JDL and NGC, current through 1995. Moreover, in his affidavit, R.J. Braunschweig states that both NGC and JDL "continue to be active Washington corporations." The companies plainly, therefore, could not have legally merged. Merger is defined by Black's Law Dictionary as: "The absorption of one company by another, latter retaining its own name and identity and acquiring assets, liabilities, franchises, and powers of former, and absorbed company ceasing to exist as separate business entity.... It differs from a consolidation wherein all the corporations terminate their existence and become parties to a new one."[5]

In sum, the court finds the following. There is no question that the contract at issue was assigned from NGC to JDL. The assignment was an arms-length transaction between two bona fide corporations. There is no contention by plaintiffs that the assignment was not valid. The court finds that NGC did not notify the Navy of the assignment. NGC was not merged into JDL. The two corporations were not consolidated. JDL was not merely a lender to NGC. NGC had no further role in the contract after the assignment. JDL merely used the NGC

---

**3.** Exemplary of plaintiffs' disingenuousness is their response to Request for Admission No. 8: "After the contract was sold and assigned to JDL, JDL continued to correspond with the Navy, Pacer, and the other subcontractors and suppliers on NGC letterhead. Response: Denied. All correspondence was sent out under the name of NGC, which was still a legal corporation. NGC was maintained because of the government contracts which could not be assigned per Robert J. Braunschweig's conversation with the U.S. Department of the Navy. Robert J. Braunschweig managed the project as an officer of NGC and a bond signatory." Def.App. at 67.

**4.** This is presumably a reference to the statement in "genuine issue" No. 1 that "NGC then com-

pleted the project ... All construction management between the date of the attempted assignment and the date of completion was performed by NGC." No support for that proposition appears anywhere in the record.

**5.** An alternative characterization of the transaction was given by R.J. Braunschweig in his response to Interrogatory No. 33, where he states that he "looked at JDL like a bank: I was operating NGC and its projects; JDL provided NGC financing and credit; NGC in turn repaid JDL." Pl.App. This view of events also has no support. In any event, JDL did not comply with provisions of 41 U.S.C. § 15 (1988) relating to assignments to financial institutions.

name to create the illusion that there had been no assignment.

NGC filed a claim with the CO in July 1986. An appeal from the denial of that claim was dismissed without prejudice. (Order of May 4, 1992) (Cl.Ct. No. 91–1185C). Subsequently, both corporations jointly submitted a claim. This appeal followed the denial of that claim.

## DISCUSSION

■ The facts established in the motion papers lead to the inevitable conclusion that the CO acted properly in treating the contract as void. The Anti–Assignment Act prohibits the transfer of contracts from a government contractor "to any other party," and such transfer "shall cause the annulment of the contract ... transferred, so far as the United States are concerned." 41 U.S.C. § 15. This provision is designed, inter alia, to prevent fraud and multiple claims against the Government and to ensure that the Government is dealing with an entity that has the legal right to perform, and against whom the United States has recourse. *See Hobbs v. McLean,* 117 U.S. 567, 576, 6 S.Ct. 870, 874, 29 L.Ed. 940 (1886); *McPhail v. United States,* 181 F.Supp. 251, 149 Ct.Cl. 179, 185 (1960); *United Investigative Services v. United States,* 26 Cl.Ct. 892, 898 (1992).

■ Plaintiffs presumably sought the Government's permission for assigning NGC's contract to JDL because they thought it necessary to do so. They were correct. After their proposal was expressly rejected by the Navy, however, they nonetheless proceeded to implement the assignment. In their dealings with the Navy, they attempted to evade the consequences of this course of action by keeping silent about the transfer and maintaining the illusion that NGC continued to perform the contract, even though, by their own admission, JDL did the work. In their litigation before this court, they attempt to evade the consequences of their actions by taking positions that defy common sense and have no support in the record. They contend, for example, that the CO's denial of permission actually constituted notice of assignment, or even permission for the assignment. Alternatively, they contend that there was no need to inform the Government of the transfer, even though the Government had expressly prohibited such a transfer. They contend that the sale of NGC to JDL involved merely a sale of contract proceeds, not a sale of the contract itself. They contend that NGC completed the contract, even though NGC did nothing more after the sale than lend its letterhead to JDL. In short, plaintiffs have shown the same lack of candor with this court that they showed in their dealings with the Navy. Plaintiffs cannot rely on verbal gymnastics to avoid summary judgment.

■ The Anti–Assignment Act establishes that the Government has the right to contract with whom it wishes and to know with whom it is contracting. While there are exceptions to the force of this provision created by the statute itself [6] and by the courts,[7] those exceptions have not been argued here, and, in any event, they do not apply. Because NGC assigned its contract in violation of the Act and of its contractual obligation to the Government, NGC has lost its right to bring a claim.[8]

■ JDL fares no better. It is well settled in cases applying predecessor statutes to the Anti–Assignment Act that the assignment of a government contract in violation of the statute is a void act. Such an assignment passes no title, legal or equitable.

---

**6.** There is no prohibition on assignments of contract rights to a financing institution. Notice to the CO is required. 41 U.S.C. § 15.

**7.** For example, involuntary assignments due to receivership or judicial sale are outside the purpose of the statute, *see Western Pac. R.R. v. United States,* 268 U.S. 271, 45 S.Ct. 503, 69 L.Ed. 951 (1925); *Davis Sewing Mach. Co. v. United States,* 60 Ct.Cl. 201, 221, 1925 WL 2797 (1925), as are mergers or acquisitions of a corporation, *see Seaboard Air Line Ry. v. United States,* 256

U.S. 655, 41 S.Ct. 611, 65 L.Ed. 1149 (1921), and a change in the form of the business, *see Thompson v. Commissioner of Internal Revenue,* 205 F.2d 73 (3d Cir.1953).

**8.** The court notes that the concealed assignment made it impossible for the Government to monitor whether NGC was in compliance with the contract provision requiring NGC to do at least twenty percent of the work itself.

*St. Paul & D.R. Co. v. United States,* 112 U.S. 733, 5 S.Ct. 366, 28 L.Ed. 861 (1885); *Chouteau v. United States,* 9 Ct.Cl. 155, 1800 WL 766 (1873), *aff'd,* 95 U.S. 61, 24 L.Ed. 371 (1877). Moreover, an action by the putative assignee is barred because the contract is nullified. *Wanless v. United States,* 6 Ct.Cl. 123, 1800 WL 717 (1870). While the Government can waive the effect of the statute by recognizing the validity of the contract and the assignment after the fact, *see Tuftco v. United States,* 614 F.2d 740, 222 Ct.Cl. 277, 285–86 (1980), that did not occur here. The necessary privity of contract between JDL and the Government is missing. *See Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984). JDL's claim must also be dismissed.

## CONCLUSION

Defendant's motion for partial summary judgment is granted. Plaintiffs' attempted assignment voids the contract. NGC cannot prosecute its claim. JDL has no standing to advance the claim because the assignment was void. It thus does not stand in privity of contract with the Government. Accordingly, JDL's claim is dismissed. Entry of final judgment will be deferred pending resolution of the Government's counterclaim. The parties are directed to file a joint status report on or before June 12, 1995, proposing steps to resolve defendant's claim.